Good morning, Your Honors. May it please the Court, my name is David Barmack. I represent the appellants Kelly Capital, Kelly Escrow Fund 5, and the SEI Private Trust. For convenience, I will refer to them jointly as Kelly. This case involves a contract which is governed by New York law, in which, as the District Court correctly held, the parties purposefully did not address who would pay the post-closing taxes of the S&M Brands Qualified Settlement Fund. Well, that gets me to one question. If the parties deliberately obfuscated that issue so as to permit Kelly to take up the issue with the IRS, wouldn't that create a situation where the Court properly would look at outside evidence? No, Your Honor. Clearly not under New York law. Because the contract under New York law, and there is a line of not less than six New York cases on this point, tells us compellingly and without exception that this is not a case of obfuscation, and omission is not an ambiguity under New York law. That is the key place where the District Court went wrong. After correctly determining... Well, see, Section 501 makes a provision for the payment of taxes by S&M up until the closing. Correct. And there's a negative pregnant, it seems to me, that would flow from that, that after that the taxes shift to Kelly. But that was left open in order to permit, at least the explicit articulation, to permit Kelly to try to take it up with the IRS. But I'm not sure it is even clear on its face by negative implication. And you can address it, but I don't know what else they're talking about, if that's what they're writing. Thank you, Your Honor. Two points. First, I disagree that, in fact, Kelly intended to take it up to the IRS, and that was behind this. But we're not here to contest Judge Payne's findings of those facts on parole evidence. What we're here contesting is the resort to parole evidence at all. And with all due respect to the position reflected by Your Honor's question, the fact of the matter is that in New York it is entirely clear under New York law that negative pregnancy, failures to address implications, do not a enforceable contract provision make. New York law is- Well, let me ask you this. That isn't my biggest question on ambiguity. The biggest question on ambiguity seems to arise from a drafting assumption that fails to treat these funds as separate entities for tax purposes. They may not be separate entities for liability like LLCs and corporations and so forth. But it seems to me that draftsmen should have recognized that there was a distinction of the taxes owed by the fund and the taxes owed by the owners of the fund. I agree, Your Honor. And if that's the ambiguity I think the district court latched on to in order to conclude that when they talk about the payment of taxes it's just not clear whether they're talking about the funds taxes or the owners of the funds taxes. And even that statement sounds bad if you don't recognize they're separate entities. I think it is true that it was important for the parties to recognize that there were really three separate taxpaying entities, Kelly, S&M Brands, and the Qualified Settlement Fund. But they did recognize that. And they recognized- Well, the contract didn't. No, they did, Your Honor. The contract explicitly did because in 501M what the contract says with respect to the taxes pre-closing is that S&M Brands is required to pay all applicable federal and state taxes of S&M Brands and of the Qualified Settlement Fund. That sentence alone reflects very critically and importantly that the parties recognized and the contract recognized that there were three separate and distinct taxpaying entities. However, when the provisions then turn to address the taxes to be paid by the purchaser in 5.02A, and these are the only two places where taxes are referenced in the agreement, what that provision says is that the purchaser is required to pay all applicable federal and state taxes required to be paid by the purchaser. It does not go on to say required to be paid by the purchaser and by the Qualified Settlement Fund. So 501M reflects in stark relief the fact that the parties knew that there was this third taxpaying entity and they addressed whose responsibility it was to make sure that that third taxpayer's taxes were paid prior to closing. And that obligation was assigned to S&M Brands. It wasn't left with the QSF. S&M Brands had to pay the QSF's taxes. With respect to post-closing obligations, they did not assign the obligation to pay this third party's taxes to anyone. Why did you address 201C? I haven't yet addressed 201C. Oh, you haven't gotten there. I was talking about 501M and 501A, Your Honor, which are the two provisions that address specifically the taxes. So when they turned to the post-closing taxes, they didn't assign the obligation to pay the taxes to anyone. They didn't say, as they had in 501M, that S&M should pay them post-closing. They didn't say in 5012 that Kelly Capital, the purchaser, should pay them. They left it. They didn't assign that obligation. Having not assigned the obligation, the obligation to pay those taxes remains where it always was, and that's with the Qualified Settlement Funds. And what Judge Payne correctly— That doesn't square—that doesn't square—that it remains with them doesn't square with 201C. Well, I disagree, Your Honor. Because 201C says not only do they take ownership, but they get all the benefits and they have all the duties. Yes, they have the duties related to the escrow funds, but there is a distinction between the escrow funds, which were owned and always were owned, bought solely by S&M Brands, put in escrow pursuant to the tobacco escrow statutes. S&M Brands has all the rights prior to this transaction, all the rights to the income as it is earned, and all the rights to the principal remaining at the end of the 25-year term following 25 years after each tranche of money is contributed. They have all the rights, and that is what that provision addresses. What that provision does not say is that what is transferred to Kelly are not only the duties of S&M Brands with respect to the escrow funds, but also the duties of the Qualified Settlement Fund as an independent taxpayer. And again, whatever – Are these funds registered in a name? Is there a name with the IRS that they're registered in as owner? No, not as owner, Your Honor. What happened is the funds were established back in 2000 when the first payment was made. At that time, it was set up as the S&M Brands escrow account, and that's what it is. And there are actually subaccounts that are maintained. There's no registry? What happens is, and happened in 2007 after S&M Brands got the private letter ruling to treat the funds as a Qualified Settlement Fund, pursuant to regulation, they filed a form to get a taxpayer ID number and assign the name to that taxpayer, if you will, of the S&M Brands Qualified Settlement Fund. That taxpayer now has a tax ID number. That taxpayer files a tax return every year and has done since 2004 because they were able to go retroactive a few years, and pays taxes on all the interest that it earns. That is the only status, purpose for being of that Qualified Settlement Fund. You're saying the contract is not ambiguous? Correct.  Doesn't it demonstrate that Kelly was to assume the risk of the QSF level tax obligation all through the negotiations? No, we disagree with that. What we believe— Well, you've got to hire a lawyer and a bunch of accountants to see if you can get around that problem. What we, in fact, believed, and in the end, I think S&M Brands believed it as well, is that there was a good chance that after the transaction, the Qualified Settlement Fund would no longer have to pay tax on the transferred escrow releases. And, in fact— Well, there's been factual findings about that before the district court. Correct. The district court rejected that position. The district court disagreed. So you can espouse it, but you haven't challenged the factual findings. And we do not. But Judge Floyd has asked me about my understanding of the background of what happened, and that's what I'm addressing. And the district court found they didn't. Agreed to what, Your Honor? To your understanding of what was going to happen after the transaction. You represented, and I think the other side agreed, but they didn't. And the district court agreed with them. But where the district court went wrong was by looking at that evidence at all. Well, that's a whole different question. But it is where I started and where I end. We are not here challenging the court's determination of the parole evidence. We are here— So if we conclude, as the district court did, that the contract was ambiguous, can you possibly win? No. We stake our appeal on the basis that the district court erred by concluding that the contract was ambiguous. In fact, it is unambiguous. Let's say that we agree with you that it's not an ambiguous contract. That doesn't change the outcome of the case unless the answer to the question— the second question is, did the district court err in concluding that Kelly's conduct constituted an anticipatory breach of the contract? Isn't that where the dispute is? No, Your Honor, because that is an element of the dispute, but the dispute in the first instance is whether or not, irrespective of the anticipatory breach, if we didn't have that issue at all, there would still be a dispute that led to our filing of the declaratory judgment action, which was, who was the responsibility to pay the QSS taxes with respect to the escrow releases assigned to Kelly? Was that responsibility and tax obligation also assigned to Kelly? And we say that it was not. And that is because in 502A, there is no reference to a transfer of that obligation, the taxes required to be paid by the QSF, to Kelly. It's simply omitted as the district court properly found. And he scoured not only 502A and 501M. He looked at the entire contract, and he goes through all of his reading. And what he ends up concluding is that the part nowhere in the contract, quote, unquote, nowhere in the contract is there any specific delegation or assignment of the obligation to pay the QSF's taxes post-closing to Kelly or to anyone else. He said that was very clear. Where he went wrong was then to assume that that failure to address that point created an ambiguous contract. I implore the court to look at the line of New York cases. At the highest court of New York, the Court of Appeals, the Reese case, followed by the Greenfield case, followed by Vermont Teddy Bear, all of which are cited in our papers, are very, very clear that in facts similar to this, the court has ruled time and time and time again that when something is omitted by the parties, particularly where it's omitted by parties engaged in negotiation represented by counsel and being sophisticated parties, particularly where there's an integration clause, the contract is not ambiguous. Parole evidence will not be allowed. And the contract will be enforced without the omitted term because it is not part of the deal. And it's very clear. And the courts have done that. Why didn't the court in C govern the responsibility? It seems to me the court focused on that and to take on all the duties of those matters assigned, having all the benefits and taking on all the duties with respect to the matters assigned. Because, Your Honor, when the parties knew how to explicitly assign the tax responsibility to the third-party taxpayer, the Qualified Settlement Fund, which was not a party to the contract, they knew how to do that and they did it very expressly. It's consistent with 201C. They say under M that S&M has to pay those taxes with respect to the funds only up to the time of closing. After closing on 201C, all responsibilities and duties and obligations and benefits are transferred to the new, to Kelly. And you don't need to provide an additional thing unless you're going to contract, maintain to the contract. And you say that doesn't cover taxes. It doesn't, Your Honor. I don't know why. Well, it does. What's the limiting language? Because the part, and again, if you look at New York law, it's clear that when the parties... I'm talking about the contract now. I understand. But what New York law tells us about contract interpretation is that where the parties can say something expressly and have failed to do so... I can say a bunch of things. I can conceive of about 20 provisions they could have added. That doesn't add anything to the argument. The question is they have an express provision in 201C that says all duties, obligations are passed on to the purchaser and benefits of these funds, right, of these escrow funds. But the obligation to pay the tax is a duty of the Qualified Settlement Fund. It is not a duty of S&M Brands. The Qualified Settlement Fund was not a party to the contract. S&M Brands was a party to the contract with Kelly. The fund couldn't be a party. At least I don't understand it. If it is, it makes it even dicier. But I thought the fund was just a separate entity for payment of taxes. Correct. It's not an entity recognized by any state or federal government as an entity that can be sued or sued. I think that that's true, Your Honor. I think it's merely a tax-paying vehicle established under this regulation to impose this additional tax. That's what I thought. And it seems to me, then, that you're, well, you're basically saying they didn't address the taxes post-explicitly addressed taxes of the fund, that the fund would have to pay post-closing. Correct. And that, therefore, under New York law, the tax chips fall where they may. It may mean that the QSF has to pay them. It may mean that, in fact, because of the transfer, there's no obligation to pay them. But what is clear is that there was no explicit assignment to Kelly or assumption by Kelly of that tax obligation. I'll reserve the rest of my time. Thank you. Mr. Haynes? He's put in all his eggs in the basket of ambiguity, and so it seems to me that's the issue. Thank you, Your Honor. Absolutely. May it please the Court, my name is Brian Haynes, and I represent S&M Brands. It is true that Kelly Capital has put all its eggs in the basket of an argument that Kelly's post-closing obligation to pay the taxes or allow them to be paid is not addressed in any fashion in the IRTAs. And that's simply not correct. There are many provisions that read, standing alone or together, address Kelly's obligation to see to it that those taxes are paid after closing. So you're disavowing the District Court's ambiguity analysis? We actually do think that the IRTAs clearly and unambiguously support our position, as we argued in summary judgment in the trial court, but obviously we don't need to show that for purposes of this appeal. All we need to show for purposes of this appeal is that there's at least an ambiguity. And in order to show that there's at least an ambiguity, we have to show that there's a plausible argument, a reasonable argument, for S&M Brands that the IRTAs allocate post-closing responsibility for the taxes to Kelly. And again, there are several provisions that we think clearly and unambiguously say that, but at a minimum plausibly say that enough to yield an ambiguity. Which provisions are you relying on? Section 5 of the IRTAs, Your Honor. Section 2 of the IRTAs. 5 is too big. You've got to give me a paragraph. Section 501M. Okay. Let me start with that. Well, just give me the list and then you can go to that. Section 501M, section 502A, section 201A, section 201C, and the escrow agreement, and particularly sections 20, section 9, and section 3. All right. You can go now, Tom. You were going to go to 501M. Let me start with 501M. First of all, there's no dispute that 501M, the first part of 501M, cuts off S&M Brands' responsibility for the taxes at closing. Kelly doesn't dispute that. Indeed, Kelly admits in its brief that there is no provision in the IRTAs that assigns post-closing tax responsibility to S&M Brands. So clearly by negative implication, S&M Brands can have no responsibility for the taxes after closing. Then you turn to the second part of section 501M, which talks about any claim that the IRS might make for post-closing QSF taxes. And what that says is that in the event there is such a claim against S&M Brands, Kelly has to pay S&M's legal bills as well as all directly related expenses, which has to include the QSF taxes. It doesn't make any sense to require Kelly Capital to pay S&M Brands' legal fees in defending an IRS tax claim, but not to pay the taxes themselves. And those directly related expenses are in fact the taxes themselves, and we cite a case for that proposition. Turning next to section 502A, again reiterates what the second half of section 501M says, and I would suggest that those provisions be read together. Section 502A requires Kelly to pay the taxes with respect to the assigned escrow releases and the related escrow funds received by it. Now Kelly says that 502A just speaks to its obligation to pay ordinary income taxes on the assigned escrow releases, but they already had that obligation. And 502A goes on to add that Kelly has to pay the taxes with respect to the related escrow funds, which is defined in the IRTA with reference to the qualified settlement funds. So the only thing that related escrow funds could mean, that term could mean, is the qualified settlement fund taxes themselves. Now Kelly points out that the parties use different language, on one hand talking about S&M Brands' obligation to pay the taxes before closing and Kelly's obligation to pay the taxes after closing. That is true, but that actually was very logical for the parties to do that. In the first part of section 501M, it talks about S&M Brands' obligation to indemnify Kelly for a loss to the assigned escrow releases. The parties wouldn't have done that with respect to Kelly's post-closing obligation because S&M Brands wouldn't have had a loss to the assigned escrow releases. It was not acquiring any assigned escrow releases. So it's actually quite logical in this instance for the parties to have used different language to have described on one hand S&M's pre-closing obligation versus Kelly's post-closing obligation. Although if we look at the parole evidence, there was, at one time, a provision like you say would be very logical to omit. Correct, and obviously I could argue about parole evidence all day. I'd love to talk about it, but as Kelly has framed the issues in this appeal, it's not relevant to the extent Kelly obviously relies on parole evidence, which it has in its brief. It's not proper. Sure, the parties could have come up with better language. I think we would all realize after three years of litigation that might have been a good thing. But again, the question for purposes of this appeal is whether the language is good enough, whether it's good enough to support a reasonable argument in S&M Brands' favor. Let me turn to Section 2 of the ERDAs. First, Section 2A. S&M Brands in Section 2A essentially conveyed to Kelly the limited bundle of rights that it owned under the escrow agreement. And the words that the parties used to convey S&M Brands' limited bundle of rights, they said S&M Brands is conveying its right title and interest to the escrow releases. So S&M Brands was only conveying, and indeed all that it could convey, were the rights that it owned prior to the transfer. And Kelly actually concedes in their brief that S&M Brands' rights to those escrow releases prior to the transfer were subject to the payment of the Qualified Settlement Fund taxes, first by the QSF and then to S&M Brands. So in 201A, S&M Brands only sold what it could sell, which was a right net of QSF taxes. Turning to Section 201C, as was discussed earlier, Kelly assumed all of the duties and obligations of the ownership of the assigned escrow releases. As was discussed in the briefs, one of the duties and obligations that S&M Brands had before it sold the escrow releases was to see to it that those taxes were paid on the assigned escrow releases. If Kelly Capital is assuming those same duties, then necessarily it assumed the duty to see to it that those taxes were paid. Let me also talk about the escrow agreement. Not much has been said about that before now, and Kelly only touches on the escrow agreement in their brief, but it's actually quite important. The escrow agreement is part and parcel of the ERDAs that are subject to this dispute. It's incorporated by reference, and indeed, in an acknowledgment agreement that's also part and parcel of the ERDAs, Kelly agreed to be bound by the escrow agreement. And Section 20 of the escrow agreement rather explicitly addresses the obligation to pay QSF taxes. Section 20 requires the escrow agent. It says the escrow agent shall comply with all applicable tax, payment, and filing requirements, including but not limited to those imposed under Treasury Regulation 1.468B, which is the QSF tax regulation. So that requires the escrow agent to pay the QSF taxes after closing. Now the question is, where does the money come from to pay those taxes? That's part of the problem with Kelly's argument is they never address the question, how do these taxes actually get paid after closing? Under 501M, S&M Brands responsibility is cut off after closing. If S&M Brands doesn't pay it and Kelly doesn't pay it, as it says it's not obligated to do, where does the money come from? Well, the escrow agreement actually answers that question. In Section 9, it explicitly says that Kelly, which is standing in S&M Brands' shoes pursuant to the acknowledgment agreement, that Kelly is responsible for reasonable expenses, charges, council fees, or other disbursements of the escrow agent. And then in turn, it says the escrow agent can take money from interest to pay those charges. So read together, these provisions say that the escrow agent pays the taxes from the interest that is generated by the qualified settlement funds that have been acquired by Kelly. The principal funds held in escrow cannot be invaded for any reason other than state judgments or settlements are released 25 years down the road. So there is only one source of funds to pay. Does Kelly get the residual interest too, 25 years down the road? Assuming there are no state claims. Assuming the state claims didn't exhaust it. Correct. They would get the residual. They would get the residual interest. That is correct, Your Honor. Let me just discuss briefly. We actually think that the requirement to pay the QSF taxes is actually self-executing. Because S&M Brands is selling a bundle of rights that is subject to the escrow agreement, as we discussed, and the escrow agreement requires those taxes to be paid out of interest. Nothing really more needed to be said about the qualified settlement fund taxes, although the parties did in Sections 2 and Section 5. But ultimately, the QSFs do have to pay the taxes, and the QSFs need a source of funds to pay the taxes. The question is, did you transfer them after the payment of taxes, or do they carry along the tax to the person who bought it? And the asset does carry along with that obligation because the asset that is being We could have sold it post-tax. We could have actually warranted, for example, that we would pay those taxes after closing. But even Kelly doesn't say that S&M Brands did that. And, in fact, if we were to do that It somehow suggests that the QSF somehow pays its own taxes. You both sort of suggest that. How can that be? Because as Judge Nemar said, it's not an entity that makes decisions on when it's paid. It is kind of a strange duck, for lack of a better word. Is there a trustee, a person trustee who manages the funds? The trustee, in essence, is the escrow agent. Does the trustee pay the taxes from the interest? Well, that's what it's supposed to do under the escrow agreement. That's, again, Section 20 of the escrow. Whether that trustee is going to act before the transfer or after the transfer. And what it says, actually, it gives the option of either one, frankly. The appropriate way to do it, consistent with the QSF tax regulations, would be QSF first pays the taxes, then release to the transferor or some third party that pays ordinary income taxes. Nobody's paid taxes yet, right? No, under Kelly's stewardship of the assigned escrow funds, no, it has not paid the taxes. And they weren't paid out before it was transferred to Kelly? The qualified settlement funds paid the taxes before the escrows were transferred to Kelly. That's in accordance with 5M? Correct, correct, with the first part of 501M. Before the transfer, the trustee did pay the taxes on the interest? The qualified settlement funds paid the taxes. After they're assigned, they haven't been paid yet? They have not been paid. Internal Revenue Service, no one would know about this? That's why we're here. Well, they've got their own issues. That was really the whole genesis for the dispute. It came about when Kelly attempted to invoke its option to buy more escrow releases. It goes back to Judge Floyd's question about the breach, the inventory breach. So this all came about when Kelly, on one hand, asserting that it wouldn't pay or allowed to be paid the QSF taxes from the releases that it acquired, and on the other hand attempting to exercise an option to buy more. And frankly, our client wasn't interested in a scenario where it could arguably be countenancing a tax evasion. My most direct question to you is the Internal Revenue Service, has they made any move? Do they know about this? Not to my knowledge. I'm not aware of that. You know, at this point, these releases as a practical matter and the escrow funds as a practical matter are controlled by Kelly. And again, that's the purpose of the Acknowledgement Agreement. It says Kelly takes control of these escrow funds. They're held in S&M Brands' name only, but Kelly gets to invest the funds. Kelly gets to switch escrow agents if they want to. S&M Brands doesn't have any control over these funds whatsoever. Was this agreement filed with the IRS? I don't believe so, Your Honor. So they don't know it's been assigned yet? Anything's been assigned? Not to my knowledge, Your Honor. That wasn't in the record, in the trial record. As you know, Michael Kelly adopted a theory that this QSF tax obligation would be extinguished by virtue of the transaction. Our client didn't have any opinion on that theory whatsoever. It frankly didn't matter to our client because it was our belief and continues to be our belief that the IRTS has assigned that responsibility to Kelly. So we didn't do any investigation or research into that. So when the IRS wakes up, who gets the notice? Kelly. Assuming you affirm the trial court's decision. They don't even know about Kelly. Yeah, they don't know that it's been transferred to Kelly. That goes back to Judge Niemeyer's original question to you. The IRS is not on notice that this has been transferred to Kelly. Well, if, for example, notice were given to S&M Brands, we would obviously point in Kelly's direction. And pursuant to 501M, that's when the second part of 501 The IRS would say it doesn't make any difference. They're going to go against you because you're the registered owner. I don't think so because we would have a declaratory judgment as we have now, and assuming this court affirms it, saying that Kelly must pay or allow to be paid those taxes from the releases that it acquired. Let me just briefly address, even assuming you agree that the IRTSs don't address in any fashion the post-closing QSF tax obligation, which they do, an interpretation like that would render the deal commercially unreasonable or absurd, which under New York law allows the court to avoid even a literal interpretation. We don't think that's necessary, but in this case, as I mentioned before, Kelly's interpretation is absurd and is commercially unreasonable because it doesn't leave any source of funds to pay the taxes. Let me just also address briefly the point about anticipatory breach. Kelly says that even if you disagree with their position on the interpretation of the IRTSs, they have not anticipatorily breached the agreements because all they did was go to Judge Payne and ask for a declaratory judgment. But that's not all they did. In fact, as you pointed out, and as was in the record before the trial court, Kelly hasn't paid the taxes at all. So assuming you agree with our interpretation, Kelly has anticipatorily breached the agreement by not paying the taxes. Furthermore, as was the evidence before the trial court, Kelly explicitly said, we're not going to pay the taxes because we didn't expect to have to. In that scenario, that is an anticipatory breach. Kelly did more than simply filing a declaratory judgment action and asking the court for an adjudication of its rights. Let me go back to my initial question. We don't have to find, well, we'll have to find, assume we find that the contract, that the district court erred in finding, in concluding it was ambiguous. And we say that he did it, he did err. But if we find that the district court did not err in that Kelly's conduct constituted an anticipatory breach of the contract, you still win. For a couple of reasons, actually. Even if you find that the contracts did not address the post-closing QSF responsibility in any form or fashion, you've still got to consider whether this deal is commercially reasonable. And the evidence before the trial court was that this deal was not commercially reasonable. Again, for two reasons. Number one, under Kelly's interpretation, there's no source of funds to pay the taxes. And number two, the interpretation urged by Kelly would have required S&M Brands to sell this asset, this $70 million asset, at a loss. At a $1 million or more loss. Conservatively, a $1 million loss. So even if you find that this term was not addressed ambiguously, clearly, or otherwise, you've still got to consider commercial reasonableness. And in considering that, you would still have to affirm the trial court's decision. Correct. Absolutely. If there are no further questions, I'll just ask that the court affirm the judgment of the trial court. Thank you. Mr. Bormack. Thank you. A few points. First of all, there is a source of funds from which the taxes can be paid by the QSF. And that is because the QSF actually has in its name, originally there were about $200 million roughly in escrow accounts. The escrow releases, the right to interest, and the residual right 25 years down the road to principal, for only about $70 million of those were sold to Kelly. So there's $130 million or so of escrow releases, and more being escrow accounts. They're not owned by S&M. That are still owned by S&M Brands. They come out of the things that they own. Yeah, and there's actually a good reason for that. That doesn't make any sense. Well, it does. And the reason is, is because S&M Brands has enjoyed the benefit of the QSF structure. The whole reason. On a yearly basis, I mean, based on the interest income. And if you keep that theory and just expand it, they sell all these assets and have to pay taxes, continue to pay taxes on the diminishing amount of funds that they have. Yeah, and that actually is a reasonable result. And it's reasonable for this reason. That is them paying the piper, as required by 468B, for the substantial benefit that they started to get only in 2007. For the first time, being allowed to deduct, take a present current deduction for the payments being made into escrow. Prior to 2007, if they had a $15 million contribution to be made into escrow under the statute, they would have to make that contribution. They would have to have paid income tax on the revenue they received from the sale of those cigarettes, paid at 40%, $6 million in tax, but they couldn't take it from the $15 million that was being taxed because they had to give that into escrow. What the QSF formation allowed them to do was suddenly to take that $15 million that they were contributing to the escrow and get a current tax deduction for them. That had a huge, in my example, a more than $6 million immediate benefit to them in current cash. In exchange for that benefit, IRS, Congress, extracts a price. And that price is the obligation to pay going forward. But that's the deduction for the principal. In other words, you put the fund, you create the fund, you get to deduct as a business expense. But the interest earned by the fund is also taxable, and we're talking about the taxation on the interest. But without the QSF device, you could not deduct the principal. You're mixing the tax benefit that's allowed with respect to the creation of the fund with the income that is earned by the fund, and it would be payable regardless whether they had the deduction. Because that's the tax burden that was extracted by Congress, is the burden to pay tax on that income as it's earned once the amounts that you've been able to take a deduction for have been paid into the fund and generate interest. And what Congress has done through this device of the Qualified Settlement Fund, which is an unusual one, but what Congress has done is said you couldn't before take a deduction. We're going to allow you to take a deduction, but we're going to extract from you the tax burden going forward as those monies, unless and until they're paid out to claimants for injuries and damages. As those monies are earning interest, you're obligated to pay tax on them. Of course, you pay taxes. You pay taxes on the interest. But if they sell those funds that produce the interest, then the person who has the funds and gets the interest should pay the tax. And there's no question that each party, S&M, Brands, and Kelly, pays interest, pays tax on the interest that's paid to each of them. The question is this other layer of tax. That's the second level payment. Correct. I'm talking about the amounts earned by the funds themselves. Correct. And that is the burden that Congress has attached in this unique circumstance. Thank you, Your Honor. Thank you. We'll adjourn court for the day and come down and re-counsel. This honorable court stands adjourned until tomorrow morning at 930. God save the United States and this honorable court.
judges: Paul V. Niemeyer, Diana Gribbon Motz, Henry F. Floyd